Maurice **SANFORD** and **Jim Johnson,**
Petitioners,

v.

Terrell Don **HUTTO,** Commissioner, Arkansas Department of Correction,
Respondent.
No. PB–74–C–168.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

June 3, 1975.

Robert A. Newcomb, Pine Bluff, Ark. (inmate atty.), for petitioners.

James W. Atkins, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

HENLEY, Circuit Judge, Sitting by Designation.

The petitioners in this habeas corpus proceeding, Negro males named Maurice Sanford and Jim Johnson, are incarcerated in the Cummins Unit of the Arkansas Department of Correction pursuant to their conviction for rape in St. Francis County Circuit Court after a jury trial in October, 1969.[1] They challenge their conviction on the ground that county officials purposely and systematically excluded Negroes from the jury venire from which the jury panel that convicted the petitioners was chosen. After consideration of the evidence presented at a hearing and the parties' briefs, the court believes that the petitioners' motion for a writ of habeas corpus should be granted.

Before 1970 Arkansas remained one of the few states which selected its juries through the personal judgment of jury commissioners rather than by a

1. Petitioners have exhausted their state remedies as required by 28 U.S.C. § 2254 by appealing their conviction to the Arkansas Supreme Court and presenting the same issue now raised before this court. Johnson and Sanford v. State, 249 Ark. 994, 463 S.W.2d 400 (1971).

random selection process. Petit juries were chosen in Arkansas by a panel of three jury commissioners who were appointed by the Circuit Court for each county.[2] Ark.Stat.Ann. § 39–208 provided that the county commissioners were to select from the qualified voters of each county 24 to 36 persons to serve as petit jurors and up to 12 persons as alternate petit jurors. In addition, the commissioners could provide a list of not less than 25 persons to serve on a special panel of petit jurors in the event that the regular and alternate panels were exhausted. Ark.Stat.Ann. § 39–220. Under this system, the commissioners could choose any elector to serve who was "of good [moral] character, of approved integrity, sound judgment, and reasonable information." Ark.Stat.Ann. § 39–206. In making these selections, the commissioners were required to meet continuously and in seclusion until they had completed their duties. Ark.Stat. Ann. § 39–205. From 1934 to 1969 all jury commissioners appointed in St. Francis County were white.

At the hearing, the parties stipulated that the jury venire for the August term of the St. Francis County Circuit Court consisted of a regular panel of 36 people of which 6 (16.6%) were Negro, an alternate panel of 18 people of which 3 (16.6%) were Negro, and a special panel of 46 persons of which 2 (4.0%) were Negro. The court also accepts plaintiffs' contention that for the ten terms of Circuit Court in St. Francis County between February, 1965 and August, 1969 there was an average of 11.7% Negro membership on the jury venires with a high of 15% Negro on the jury venire for February, 1968 term and a low of 4% Negro for the April, 1966 term of court.

The parties further stipulated that the population over the age of 21 in St. Francis County in 1960 was 16,366 of which 8,103 persons were Negroes (49.-51% of the population), and that in 1970 the total population over the age of 21 was 16,363 of which 6,660 were Negro (40.7% of the population). The petitioners proved that the total number of registered voters in St. Francis County for the year ending May 31, 1966 was 10,100; for the year ending May 31, 1967, 11,225; for the year ending May 31, 1968, 12,300; for the year ending May 31, 1969, 13,133; and for the year ending May 31, 1970, 12,916.

Mrs. Dorothy Barnard, the County and Probate Clerk of St. Francis County, guessed that about 50% of the registered voters in St. Francis County were black. Unfortunately, available data does not reflect the exact percentage of registered black voters in St. Francis County since the voter lists from which juries are chosen contain no racial designation. However, the court believes that it can compute the least possible number of registered Negro voters by the following method. Beginning with the figure of 8,103 Negroes over the age of 21 in St. Francis County in 1960, and using a figure of 144 per year decrease in this Negro population between 1960 and 1970, a total Negro population over the age of 21 for any year can be reached by taking the appropriate yearly multiple of 144 and subtracting it from 8,103. This number is subtracted from 16,366 which represents the total population over the age of 21 in St. Francis County in 1960, thereby reaching a figure for the total white population over 21 for any given year. Next, the total white population over the age of 21 for any given year is subtracted from the total number of registered voters in St. Francis County for that year, thereby giving the number of Negro voters for that year assuming that every eligible white in the county was registered to vote. This same procedure can be used to find appropriate percentages where less than 100% white registration is assumed.

Using the above methodology, the following percentage of registered black

2. Jury selection procedures utilized in petitioners' trial have been superseded by the Arkansas Jury Wheel Act of 1969. Ark. Stat.Ann. § 39–201 et seq. (1973 Cum.Supp.).

voters can be computed. Assuming that every white person over the age of 21 was registered to vote in 1966, then 10% of all voters in St. Francis County in 1966 were black; for 1967 the percentage of black voters would be 17%; for 1968 the percentage would be 23%; and for 1969, the year of petitioners' conviction, the percentage would be 25%. Assuming that only 90% of all whites in St. Francis County over the age of 21 were registered in 1969, the percentage of black voters would be 32%; assuming only 85% white registration, the percentage of registered black voters would be 36%; and assuming 80% white registration, the percentage of black voters would be 40%.

While the record does not show whether the alternate and special panels were used in the selection of the panel which convicted the petitioners in 1969, the court holds that the mere possibility that these panels could have been used to select the petitioners' jury compels this court to consider the total racial composition of all three panels in passing judgment upon the constitutionality of the selection procedure used. Based on this total figure, the jury venire consisted of 11% Negro. Even assuming that every white over age 21 in St. Francis County registered to vote, a disparity of 14% exists between the percentage of blacks on the jury venire and the percentage of registered black voters in the county. Accepting Mrs. Barnard's 50% estimate, the disparity rises to 39%.

The purposeful exclusion or underrepresentation of blacks from a jury venire constitutes invidious discrimination violative of the Fourteenth Amendment. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Coleman v. Alabama, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964). A prima facie case of jury discrimination may be shown by any one of three methods. First, a prima facie case is established by a showing that (1) a "substantial disparity" exists between the percentage of presumptively qualified Negroes in the county and the percentage of Negroes actually chosen for jury duty and (2) the disparity is coupled with some positive indicia of discrimination or by a showing that the selection procedure provides an opportunity to discriminate. Turner v. Fouche, *supra,* 396 U.S. at 360, 90 S.Ct. 532; Stephens v. Cox, 449 F.2d 657, 659 (4th Cir. 1971). Secondly, a prima facie case may be proved by showing that Negroes have been totally excluded from jury service over a long period of years in the jurisdiction where the challenged trial occurred. Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947). Finally, the Fifth Circuit has held that a showing of a "spectacular" or "marked" underrepresentation of Negroes on juries in a particular jurisdiction is by itself a prima facie case. Singleton v. Estelle, 492 F.2d 671 (5th Cir. 1974) (dicta); United States v. Hyde, 448 F.2d 815 (5th Cir. 1971). However, the Third and Fourth Circuits hold that mere statistical data alone is insufficient absent additional indicia of discrimination or a showing that the selection procedure either facially provides an opportunity to discriminate or is administered so as to effect discrimination. Smith v. Yeager, 465 F.2d 272, 274 (3rd Cir. 1972); Stephens v. Cox, *supra.*

While this court will not attempt to define precisely what percentage constitutes a "substantial" or "spectacular" disparity, the court finds that the petitioners' showing that Negroes were underrepresented by at least 14% in St.

Francis County in 1969 constitutes a "substantial" disparity. While in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court concluded that a 10% underrepresentation between eligible blacks and blacks chosen for the venire did not constitute evidence of a prima facie case, there was no evidence in *Swain* of an attempt to apply valid juror qualifications in a discriminatory manner so as to exclude Negroes. Since the commissioners in *Swain* selected hundreds of names to be placed in a jury wheel, there was less likelihood that they applied their own standards of personal qualifications for jury duty than under the Arkansas system of hand picking jurors.

■ What constitutes a "substantial" disparity depends largely on how the disparity occurred, and if it results from the use of subjective criteria—*e. g.*, "good moral character"—rather than objective criteria—*e. g.*, education, then the tolerable disparity is reduced because of a greater opportunity for intentional discrimination. Blackwell v. Thomas, 476 F.2d 443, 447 n. 7 (4th Cir. 1973). Indeed, Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) and Sims v. Georgia, *supra,* found that the petitioners had established a prima facie case where there was a 14–15% underrepresentation of Negroes and where the jury commissioners knew the race of each potential juror because the tax digests used to select jurors contained racial identifications.

■ In the petitioners' case, the jury venire was not chosen through a random selection process but rather by the subjective judgment of the all white jury commissioners. These commissioners could exercise untrammeled discretion subject to the statutory requirement that the persons selected be of "good moral character, of approved integrity, sound judgment, and reasonable information." In an effort to avoid discrimination, Circuit Judge Elmo Taylor instructed the commissioners as follows:

"Now, what I'm saying to you is, don't give me anything except a cross section of the people of this county who can meet this requirement, and this requirement is, that you have a person, I don't care whether they are male, female, young, old, rich, poor, white or black, but I want a person who is capable in your opinion of exercising good judgment on the questions that will come before the juries at the next two sessions of court.

"I want people who are free enough of prejudices of every kind that they can do that. It doesn't make any difference what race of the parties involved in the lawsuit would be, that that person still could be fair and impartial and simply look to the issues, but at the same time I want somebody who is intelligent enough to be able to exercise that type of good judgment I just mentioned on all these problems." (Deposition of Elmo Taylor at pages 5–6.)

But, in order to select jurors who met the above qualifications, the commissioners could only choose persons with whom they were personally acquainted or persons who had been recommended to them by other responsible citizens. At the evidentiary hearing, one of the commissioners, Mr. James Hickey, testified that he did not seek the recommendations of other people. Two of the commissioners, Mr. Hickey and Mr. Garland Green, testified that they each knew only about 20% of the persons listed on the St. Francis County voter registration list in 1969, and that they did not attempt to acquaint themselves with additional voters. The result is that a given jury selected by these commissioners is only an extension of the commissioners' personalities, and their failure to acquaint themselves with the identity and availability of potentially qualified persons within different segments of the population may in and of itself constitute a constitutional infirmity of the selection process. Obviously, an opportunity to

discriminate existed since, if each commissioner chose only those persons he knew, then he was aware of the race of each person considered. Utilization of either this selection procedure or of a tax digest containing racial designations results, in each instance, in the commissioners knowing the race of each person considered.

> "Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from those commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand." Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84 (1941).

While most Supreme Court cases have dealt with instances of a facial opportunity to discriminate (*e. g.*, racial designations on tax digest), the opportunity to discriminate required for a prima facie case is shown when a party

> "demonstrates that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria." Turner v. Fouche, *supra,* 396 U.S. at 360, 90 S.Ct. at 540.

A selection procedure which retains some conspicuous racial designation is more likely to be a vehicle of racial discrimination than a system, such as the old Arkansas scheme, which is racially neutral on its face, but this court is firmly convinced that the subjective criteria used by the St. Francis County commissioners in 1969 resulted in an underrepresentation of Negroes. In other words, valid juror qualifications were applied improperly. Accordingly, the court finds that the petitioners have made out a prima facie case of jury discrimination.

In an attempt to rebut this prima facie case, Mr. Green and Mr. Hickey testified that they did not discriminate against Negroes in selecting the jury venire for the August, 1969 term of court. The defendants also offered the deposition testimony of Circuit Judge Elmo Taylor who stated that due to the large number of illiterate black voters in St. Francis County, many Negroes were unqualified to serve on a jury. Judge Taylor concluded that the commissioners followed his instructions and did not discriminate against blacks.

> "Now, here's one thing that I told that jury commission, as I did all other jury commissioners, particularly in St. Francis, Lee, and Phillips Counties, where there was a large black population, I said, 'Now, I don't want you to put anybody on this jury list simply because they are black. I don't want you to leave them off because they are black, either, but if they can't meet the qualifications, I don't care whether they are black or white, I don't want you to put them on there.'
>
> "Now, you are going to find this, although we all abhor it, you are going to find that among the black race in St. Francis County, when you start looking at them, that there are fewer of them who are qualified electors, as a number one thing. Number two, you are going to find that there is a lesser number of them that are qualified as jurors because some of them can't even write and read. The ones that I feel sure that you will have to go to, the group you will have to go to is the ones that are of more information." (Deposition of Elmo Taylor at page 8.)

Judge Taylor went on to say that the commissioners should put on some "professional black people."

This court appreciates the problem with which Judge Taylor was faced and his effort to deal with it, but cannot in the constitutional sense accept his conclusion that the commissioners did not discriminate.

■ If mere general denials by public officials were to be accepted as

adequate rebuttal of a prima facie case of jury discrimination, then the constitutional guarantee to be free of discriminatory jury selection procedures would be in "vain and illusory requirement." Norris v. Alabama, 294 U.S. 587, 55 S. Ct. 579, 79 L.Ed. 1074 (1935). Bald assertions by public officials denying discrimination will not suffice. Alexander v. Louisiana, *supra,* 405 U.S. at 631–32, 92 S.Ct. 1221; Reece v. Georgia, 350 U. S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955). Here, the evidence reveals a pronounced disparity from 1965 through 1969 in St. Francis County Circuit Court, and viewed from the historical perspective of widespread racial discrimination in Eastern Arkansas, Adams v. Thompson, 313 F.Supp. 265 (E.D.Ark.1970), the general assertions of good faith by the commissioners are untenable.

This court refuses to accept respondent's claim that the inferior educational level of blacks in St. Francis County adequately explains the disparity between the percentage of registered black voters in St. Francis County and the percentage of blacks actually chosen for the jury venire for the 1969 term of court. To allow such general assertions to suffice as rebuttal would render petitioners' constitutional guarantees unenforceable. The respondent relied solely on the opinion of Judge Taylor regarding the literacy of St. Francis County blacks and failed to make a detailed explanation of how challenged jury selection procedures neutrally operated to exclude Negroes. Indeed, Mr. Green stated that the commissioners made no attempt to exclude illiterates because education was not a selection criteria.

Finally, this court has previously noted the opinion of District Judge Oren Harris in Adams v. Thompson, *supra,* in which the court found that the exclusion of Negroes from petit and grand juries in Phillips County Circuit Court from 1960 through 1968 constituted a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. While *Adams* is not res

judicata, the court regards it as strongly persuasive for the proposition that systematic jury discrimination by public officials in the First Judicial Circuit of Arkansas, of which St. Francis County is a part, was widespread before enactment of Act 568 of 1969.

Accordingly, it is the judgment of this court that the petitioners' petition for writ of habeas corpus should be granted. An appropriate order will be entered.