James BARBER, Petitioner, Appellant,

v.

James PONTE, et al.,
Respondents, Appellees.

No. 84–1750.

United States Court of Appeals,
First Circuit.

Argued Dec. 5, 1984.

Decided April 4, 1985.

Opinion on Rehearing
En Banc Sept. 18, 1985.

Bownes, Circuit Judge, dissented and filed opinion, in which Coffin, Circuit Judge, joined.

Robert L. Sheketoff, Boston, Mass., with whom Zalkind & Sheketoff, Boston, Mass., and P.J. Piscitelli, Brockton, Mass., were on brief, for appellant.

Martin E. Levin, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Frederick W. Riley, Chief, Crim. Bureau, and Barbara A.H. Smith, Chief, Crim. Appellate Division, Boston, Mass., were on brief, for appellees.

Edna M. Conway, Asst. Atty. Gen., Criminal Justice Div., and Stephen E. Merrill, Atty. Gen., on brief for the State of New Hampshire, amicus curiae.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Petitioner, James Barber, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the ground that an alleged systematic exclusion of young people from his Massachusetts state court jury venire violated his constitutional right to an impartial jury drawn from a cross-section of the community.

In September of 1980 Barber, a prisoner at Massachusetts Correctional Institution at Norfolk, was charged with unlawful possession of a hypodermic syringe, unlawful possession of two hypodermic needles, unlawful possession of heroin and unlawful possession of marijuana. Prior to his jury trial, Barber moved to dismiss the venire on the grounds that an alleged systematic exclusion of young people violated Mass. Gen.Laws Ann. ch. 234, § 4 (1969) and the Massachusetts and United States Constitutions. The court held a hearing on February 1, 1981. The only evidence presented at the hearing on the pretrial motion was a copy of a report on the representation of persons age eighteen to thirty-four on Norfolk County juries that had been generated in the case of *Commonwealth v. Flaherty*, Criminal No. 76318 (Norfolk Sup.Ct.). The report indicated that for the twenty-five-month period between October 1, 1978, and October 31, 1980, young adults (age 18–34) were underrepresented by 50% in the jury-selection process.

The case went to trial on April 21, 1981, before a six-person jury (plus one alternate) that included two persons under the age of thirty-five. The jury found defendant not guilty on the count of possession of marijuana and guilty on all other counts. Petitioner appealed his conviction which was affirmed by the Massachusetts Appeals Court in *Commonwealth v. Barber*, 14 Mass.App. 1008, 441 N.E.2d 763 (1982), and unsuccessfully sought further appellate review from the Supreme Judicial Court. *See Commonwealth v. Barber*, 388 Mass. 1101 (1983). Petitioner thereafter brought a habeas petition in federal district court. The district court denied the petition and a motion for certificate of probable cause. Petitioner sought a certificate of probable cause from this court, which we granted.

The Supreme Court has long recognized that the vitality of a defendant's fundamental right to a trial by jury is dependent upon the composition of the jury.[1] In *Glasser v. United States*, the Supreme Court declared:

---

1. Unlike in England where trial by jury was a privilege not a right, in this country the right to a jury trial was incorporated into the United States Constitution and into all state constitutions as a fundamental right. *Glasser v. United States*, 315 U.S. 60, 84–85, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942) (citing 2 Story Const. § 1779).

Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of jury trial.... Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. For it is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.

315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942) (citations omitted). *See also Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946) ("The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community."); *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940).

The Supreme Court has grounded the requirement of a jury drawn from a cross-section of the community on the equal protection clause, *Hernandez v. Texas*, 347 U.S. 475, 476–82, 74 S.Ct. 667, 669–72, 98 L.Ed. 866 (1954); *Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303, 307–10, 25 L.Ed. 664 (1879), the supervisory power of the court over the right to jury trials in federal courts, *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and the sixth amendment which binds the states through the fourteenth amendment,[2] *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).[3]

In order to establish a prima facie violation of the cross-section requirement, a petitioner must show: (1) that the group alleged to be excluded is a "cognizable" or "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation in petitioner's venire is due to the systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Hernandez v. Texas*, 347 U.S. at 480, 74 S.Ct. at 671.

## I. COGNIZABILITY

The Supreme Court first considered the issue of cognizability in *Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303, 25 L.Ed. 664 (1879), an equal protection case. In sustaining defendant's equal protection argument the Court assumed that blacks were cognizable for jury selection purposes and took judicial notice of the effects of prejudice. The Court identified two constitutional values impaired by the exclusion of a cognizable group: (1) potential prejudice against the defendant, and (2) stigmatization of the group excluded from service.

In *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), a case involving discretion in the selection of women jurors, the Court spelled out the prerogatives of jury commissioners in the jury selection process:

Th[e] duty of selection ... must always accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a "body truly representative of the community" and not the organ of any special group or class. If that requirement is observed [the jury commissioners] ... may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community.

2. *See Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

3. The Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1874 (1976), specifically declares the cross-section ideal to be federal policy. 28 U.S.C. § 1861 (1976).

315 U.S. at 86, 62 S.Ct. at 472. Four years later, in *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), the Court identified additional cognizable groups including economic, social, religious, racial, political, and geographic groups within a community, and held that economic distinctions in jury selection resulted in the exclusion of a cognizable group. The plaintiff in *Thiel*, suing for damages in a federal diversity tort case, moved to strike the jury venire on the ground that poor people were systematically excluded from the jury rolls. The Court held that exclusion of people who were paid daily wages rather than paid by salary failed to satisfy the general principles underlying proper jury selection because the exemption or exclusion was completely irrelevant to a person's eligibility and capacity to serve as a juror.[4] *Id.* at 223, 66 S.Ct. at 987. The Court did not declare that daily wage earners had a particular community of interest or values distinct from the rest of the population. Rather, it grounded its decision on the possibility that those responsible for the selection of jury panels could discriminate against persons of low economic and social status. *Id.* at 224, 66 S.Ct. at 987.

In *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), the Court sustained a challenge based on systematic exclusion of women. The Court assumed that women are a cognizable group and responded to the argument that women jurors behave similarly to male jurors.

> It is said ... that an all male panel drawn from the various groups within a community will be as truly representa-

tive as if women were included. The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men, likewise, do not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded.

*Id.* at 193–94, 67 S.Ct. at 264.

Eight years later in *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), an equal protection challenge to the jury venire, the Court began to suggest the means for factually proving that a group of excluded people constitute a cognizable class so that litigants would not have to depend upon courts taking judicial notice of the cognizability of a particular group. The Court rejected the contention that systematic exclusion challenges brought under the fourteenth amendment were limited to race and color and found that Mexican-Americans in Jackson County constituted a cognizable group stating that "community

---

**4.** Thus *Thiel* made clear that the groups cognizable for jury selection are not limited to those groups possessing the immutable characteristics which trigger strict scrutiny under the fourteenth amendment. *See also Peters v. Kiff*, 407 U.S. 493, 503, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972) ("When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable."); *Pierre v. Louisiana*, 306 U.S. 354, 358, 59 S.Ct. 536, 538,

83 L.Ed. 757 (1959) ("[T]rial by jury ceases to harmonize with our traditional concepts of justice at the very moment particular groups, classes or races—otherwise qualified to serve as jurors in a community—are excluded as such from jury service."); *Witcher v. Peyton*, 405 F.2d 725, 727 (4th Cir.1969) ("There is a constitutional right to a jury drawn from a group which represents a cross-section of the community. And a cross-section of the community includes persons with varying degrees of training and intelligence and varying economic and social positions.").

prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact." *Id.* at 478, 74 S.Ct. at 670. The Court instructed, "[O]ne method by which [cognizability] ... may be demonstrated is by showing the attitude of the community." *Id.* at 479, 74 S.Ct. at 671.

## II. THE COGNIZABILITY OF YOUNG ADULTS

The Supreme Court has yet to rule on whether young adults are a cognizable group for jury selection purposes.[5] This court has twice judicially noticed that young adults constitute a cognizable group. *See LaRoche v. Perrin,* 718 F.2d 500, 504 (1st Cir.1983); *United States v. Butera,* 420 F.2d 564, 570 (1st Cir.1970). A number of state courts have also held that jurors cannot be systematically excluded on the basis of age. *See, e.g., Julian v. State,* 134 Ga.App. 592, 215 S.E.2d 496, 499 (1975) (pool in which average age of jurors was sixty-nine cannot be considered a fairly representative cross-section of the community); *People v. Fujita,* 117 Cal.Rptr. 757, 770, 43 Cal.App.3d 454 (1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1952, 44 L.Ed.2d 451 (1975) (citing age as among groups consti-

tuting cognizable classes); *Paciona v. Marshall,* 45 A.D.2d 462, 359 N.Y.S.2d 360, 362–63, *aff'd,* 35 N.Y.2d 289, 360 N.Y.S.2d 882, 319 N.E.2d 199 (1974) (systematic exclusion of students on grand jury array illegal); *People v. Marr,* 67 Misc.2d 113, 324 N.Y.S.2d 608 (1971) (exemption of students resulted in systematic exclusion of young adults 21 to 29); *State v. Holstrom,* 43 Wis.2d 465, 168 N.W.2d 574, 578 (Wisc. 1969) (court stated that systematic exclusion based on age would render jury defective but defendant failed to produce data indicating underrepresentation in pool). Because, however, the state appeals court, relying on Massachusetts Supreme Judicial Court's decision in *Commonwealth v. Bastarache,* 382 Mass. 86, 414 N.E.2d 984, 993 (1980), found that underrepresentation of young people on the venire did not constitute ground for relief and a number of other courts have rejected jury selection challenges based on the exclusion of young people, we again focus our attention on the considerations relevant to a determination of cognizability.[6] Such considerations include: (1) whether the group can be adequately defined; (2) whether the group is sufficiently cohesive to be cognizable; and (3) whether the exclusion of the group might cause juries to be biased against a defendant from that group or could encourage public prejudice against the group.

---

5. In *Hamling v. United States,* 418 U.S. 87, 137–38, 94 S.Ct. 2887, 2917–18, 41 L.Ed.2d 590 (1974), defendant alleged that the jury wheel filled from voter registration lists every four years systematically excluded young adults 21 to 23. The Supreme Court assumed, without reaching the issue, that the young are a cognizable group, but found that the evidence presented was insufficient to make out a prima facie case because there was no evidence of purposeful discrimination and that "some play in the joints of the jury selection process is necessary in order to accommodate the practical problems of judicial administration." *Id.* at 138, 94 S.Ct. at 2918. Although the Court stated that petitioner failed to show purposeful discrimination (a prima facie requirement that was largely eliminated in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)), the analysis focused on the interest of the state in implementing a jury selection process that would avoid the daily refilling of the jury wheel.

In addition, several members of the Court were in favor of hearing a challenge that wom-

en and young adults age 18–30 were systematically and purposefully excluded from grand juries and petit jury venires but the appeal was denied. *White v. Georgia,* 414 U.S. 886, 890, 94 S.Ct. 222, 224, 38 L.Ed.2d 134 (1973) (Brennan, J., joined by Douglas and Marshall, JJ., dissenting from dismissal of appeal).

6. The state contends that we should defer to the state court on the issue of (non-)cognizability. It is, however, our duty to analyze the facts so that the appropriate protection of federal rights is assured. "[W]hile the conclusions reached by the highest court of the State are entitled to great respect ... it becomes our solemn duty to make independent inquiry and determination of the disputed facts." *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967). *See also Pierre v. Louisiana,* 306 U.S. 354, 358, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1939); *Norris v. Alabama,* 294 U.S. 587, 589–90, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935).

*See Willis v. Zant,* 720 F.2d 1212, 1216 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *United States v. Test,* 550 F.2d 577, 584 (10th Cir.1976). *See also* Zeigler, *Young Adults as a Cognizable Group in Jury Selection,* 76 U.Mich.L.Rev. 1045, 1071–72 (1978).

### A. *Definition of Group*

The difficulty in delimiting a group of "young adults" has posed a problem to some courts. *See, e.g., United States v. Ross,* 468 F.2d 1213, 1217 (9th Cir.1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973); *United States v. Guzman,* 337 F.Supp. 140, 143 (S.D.N.Y.), *aff'd,* 468 F.2d 1245 (2d Cir.1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973). While we recognize that the boundaries of any age group are necessarily somewhat arbitrary, it does not follow that no lines should be drawn. Society regularly makes decisions based on age distinctions despite the fact that the lines drawn are arbitrary to some degree. *See, e.g.,* U.S. Const. art. I, § 2, cl. 2; § 3, cl. 4; art. II, § 1, cl. 5 (requiring that a member of the House of Representatives be twenty-five years of age, a Senator be thirty years old and the President be thirty-five years old); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (upholding statute requiring that state police retire at age fifty despite the arbitrariness of particular age limit) [7]; *Johnson v. Mayor and City Council of Baltimore,* 731 F.2d 209 (4th Cir. 1984) (upholding Baltimore pension provision requiring firefighters to retire at fifty-five), *cert. granted,* — U.S. —, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985).

While we recognize that legislative line drawing of precise boundaries is generally more acceptable than similar judicial efforts, *cf. Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), defining the parameters of a group excluded from jury selection is not the type of line drawing that a legislature is likely to undertake. We, therefore, conclude that if young adults can generally be conceived of as an identifiable group, "[w]e cannot allow the requirements of a 'distinct' group to be applied so stringently with regard to age grouping that possible discrimination against a large class of persons ... will be insulated from attack." *United States v. Butera,* 420 F.2d at 570. *See also LaRoche v. Perrin,* 718 F.2d at 504. Here, petitioner alleged systematic exclusion of young adults eighteen to thirty-four. We think that such a comprehensive grouping which encompasses virtually all whose chronological age entitles them to be called young adults, and which we accepted in *LaRoche,* is certainly one, if not the only, means of delimiting the group.[8] Accordingly, we take judicial notice of the fact that eighteen to thirty-four year olds represent all persons who may be characterized as "young adults."

### B. *Cohesiveness*

The state alleges that recognition of any young adult group is not possible because young adults do not have sufficient cohesiveness to constitute an identifiable group

---

**7.** In *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976), the Supreme Court stated, "The drawing of lines that create distinctions is ... unavoidable.... Perfection in making the necessary classifications is neither possible nor necessary."

**8.** We would be far less likely to look favorably on age-groups with fairly small age spans. We do not believe that an age-group of only three or four years would differ significantly from a similarly narrow span which is older or younger than the scrutinized group. *See United States v. Camara,* 451 F.2d 1122, 1126 (1st Cir.1971),

*cert. denied,* 405 U.S. 1074, 92 S.Ct. 1513, 31 L.Ed.2d 808 (1972) (persons 21–25); *King v. United States,* 346 F.2d 123, 124 (1st Cir.1965) (persons 21–25); *United States v. Olson,* 473 F.2d 686, 688 (8th Cir.), *cert. denied,* 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973) (persons 18–20 petit jury); *United States v. Gooding,* 473 F.2d 425, 430 (5th Cir.), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973) (young persons within a three-year four-month range, grand and petit juries); *United States v. Ross,* 468 F.2d 1213, 1217 (9th Cir.1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973) (21–24 age-group).

for jury selection purposes. They cite a number of cases from other circuits holding that young adults do not have a sufficient community of interest to qualify as a cognizable group. *See, e.g., United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977); *Brown v. Harris,* 666 F.2d 782, 784 (2d Cir.1981), *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982). We decline to follow Massachusetts' argument for several reasons.

Although conclusive evidence of the experimental or attitudinal distinctiveness of any group is difficult, if not impossible, to obtain many sociologists contend that young people do comprise a class with distinctive values, outlooks, manners, roles, and behavior patterns.[9] A study of juror attitudes undertaken by Professor Zeigler of Pace University and submitted at trial in *Johnson v. Durante,* 387 F.Supp. 149 (E.D. N.Y.1975), suggests that jury deliberations are affected by the exclusion of young people. In fact, Zeigler's study showed greater differences of opinion by age than by race or gender in such matters as: the inference of guilt from silence; the presumption of innocence; the predisposition of the young to break the law; and the performance and prerogatives of the police. *See* Zeigler, *Young Adults as a Cognizable Group in Jury Selection,* 76 Mich.L. Rev. 1045, 1090 (1978).

Differences in opinion absent from a jury because of gross underrepresentation of young people could be expected to affect a large number of cases, particularly those involving young adult defendants. More young adults are involved in the criminal process than any other age group. In 1983, approximately 6.4 million adults between eighteen and thirty-four were arrested compared to 2.2 million adults over thirty-four. *Uniform Crime Reports for the United States—1983* 179–180 (Released Sept. 9, 1984). Similarly, in 1982, 6.2 million persons between the ages of eighteen and thirty-four were reported arrested by federal and state officers while 2 million persons arrested were thirty-five years of age or older. And in 1981, 6.1 million persons between eighteen and thirty-four were arrested while 2.1 million persons over thirty-five were reported arrested. *Statistical Abstract of the United States 1984,* 183–84 (104th ed. 1984). Such a high proportion of young arrestees causes us to be particularly concerned about the possibility of prejudice.

As we noted in *Butera,* 420 F.2d at 570, and *LaRoche,* 718 F.2d at 504, society at large clearly distinguishes between young adults and middle aged and older adults. The draft, the right to vote, insurance rates, and restrictions on the ages of elected federal officials are just a few of the many facets of our lives geared to age. A causal glance at service and product advertising, hiring and seniority systems, organizational hierarchies, and the media reveals that almost no area of society is age blind or age neutral.[10]

To demand that a litigant show more precisely that the members of a cognizable

9. *See, e.g.,* Braugart, *The Alienation and Politics of Older, Middle-Aged and Young Adults: An Inter- and Intra-Age Group Analysis,* 2 Micropolitics 219 (1982); Lindsay and Knox, *Continuity and Change in Work Values and Young Adults—A Longitudinal Study,* 89 Am.J.Soc. 918 (1984); Vener, *Drugs (Prescription, Over-the-Counter, Social) and the Young Adult—Use and Attitudes,* 17 Int'l J. Addictions 399 (1982); Foner, *Age in Society: Structure and Change,* 19 Am.Behav.Sci. 144, 148 (1975); Neugarten and Hagestad, *Age and the Life Course* in Handbook of Aging and the Social Sciences 35–52 (R. Binstock and E. Sharras ed., 1976).

10. Today the differences associated with age are ubiquitous. Age groups differ in "labor force participation, consumer behavior, leisure-time activities, marital status, religious behavior, education, nativity, fertility, child-rearing practices, political attitudes—to name only a few." Moreover, "[o]lder people differ sharply from younger people in many of their opinions, feelings, and dispositions toward such central aspects of life as health, personal problems, or death." The old also tend to be more politically conservative, more resistant to change, and less tolerant of political and social nonconformists than the young. "It comes as no surprise, then, that each age strata has its own *distinctive subculture.*" Ziegler, *Young Adults as a Cognizable Group in Jury Selection,* 76 Mich.L.Rev. 1045, 1075 (1978) (citations omitted).

group would be influenced by the same factors or would cast their vote as a lot would make a mockery of the values the jury system is designed to protect. In essence it would require litigants to stereotype and overgeneralize the attributes and experiences of a group in order to "save" it from prejudice and discrimination. The Supreme Court has steadfastly refused to do that with racial and economic groups and women, *see, e.g., Peters v. Kiff,* 407 U.S. 493, 503–04, 92 S.Ct. 2163, 2168–69, 33 L.Ed.2d 83 (1972), and we see no reason to follow a different path for age-groups.

### C. *Underrepresentation Is Statistically Significant*

In order to establish the second element in his prima facie case petitioner must show that young adults were significantly underrepresented in the challenged venires. *Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668. To that end, petitioner presented statistical evidence compiled by a court appointed special master in *Commonwealth v. Flaherty,* Norfolk County Criminal No. 76318. The parties stipulated that the report be made part of the record. The report indicated that the venires for the period October 1, 1978, to October 31, 1980, contained approximately 20% fewer young adults than an age-blind selection process should have produced,[11] and that the venires contained less than half the young adults one could expect in a venire proportional to either the general population or the general population under the age of seventy.[12]

The master reported that the discrepancy is clearly statistically significant, that the probability of a 20% discrepancy occurring in an age-neutral selection process is less than one in 100 quadrillion.[13] The Supreme Court has found 20% underrepresentation to be constitutionally cognizable. *See Smith v. Texas,* 311 U.S. 128, 129, 61 S.Ct. 164, 164, 85 L.Ed. 84 (1940) (20% underrepresentation of blacks); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (exclusion of Mexican-Americans who comprised 14% of the community). We, therefore, find that petitioner has presented sufficient evidence of the underrepresentation of young adults to meet the second requirement of his prima facie case.

### D. *Systematic Exclusion*

Finally, to establish his prima facie case, petitioner must show that the underrepresentation in his venire was due to the systematic exclusion of young adults from the jury pools. *Duren v. Missouri,* 439 U.S. at 366, 99 S.Ct. at 669. In *Duren,* the Supreme Court held that proof of intentional or purposeful discrimination is not required to show systematic exclusion. A large discrepancy occurring over a sustained period of time where there is an opportunity for arbitrary selection is sufficient to demonstrate that the exclusion of the underrepresentation is systematic—that is, inherent in the particular jury selection process utilized. 439 U.S. at 366, 99 S.Ct. at 669. *See also United States v. Benmuhar,* 658 F.2d 14, 19 (1st Cir.1981), *cert. denied,* 457 U.S.

---

**11.** In the period between January 1, 1978, and October 31, 1980, the general population of Norfolk County was made up of 37.82% young adults and 18.16% of the jury venire consisted of persons 18 to 34. If adults over the age of 70 are excluded from the analysis because they can elect to exempt themselves under Mass.Gen. Laws Ann. ch. 234, § 1 (1984), then young adults constitute 41.46% of the eligible jurors and were selected for the venire only 18.68% of the time. The difference between the proportion of young adults in the population and the proportion of young adults on the venires is 19.56%. Excluding adults over 70, the discrepancy is 22.78%.

**12.** Based on a cross-section of the general population, young adults were underrepresented on

the general jury venire by 52% (19.56% discrepancy = 52% of 37.82%, the percentage of young adults in the population of Norfolk County). Young adults were underrepresented by 55.02% if persons over 70 are not considered (22.78% discrepancy = 55% of 41.46%, the percentage of young adults in Norfolk County when only persons under 70 are considered).

**13.** The master's report stated that 100 quadrillion (100,000,000,000,000,000) is an almost inconceivably large number. It is equal to the population of 21 million planets with a population equal to the 4.8 billion inhabitants of the earth.

1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982); *Murrah v. State of Arkansas*, 532 F.2d 105 (8th Cir.1976); *Smith v. Yeager*, 465 F.2d 272, 280 (3d Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972); *Stephens v. Cox*, 449 F.2d 657, 659 (4th Cir.1971).

Norfolk County employs the keyman system to select jury venires. Mass.Gen.Laws Ann. ch. 234, § 4 (1970). Under the keyman system, the board of selectmen prepares a list of inhabitants of good moral character, sound judgment, free from legal exceptions, not exempt, and whom the selectmen think qualified to serve as jurors. The list may contain only the names of persons determined to be qualified upon the knowledge of one of its members or after personal appearances or in response to examination by questionnaire under oath. The discretion required on the part of the selectmen in compiling the jury pool lends itself to nonrandom selection. *See* Note, *Federal Court—Juror Selection—Underrepresentation of Young Adults on Juror Source Lists*, 19 Wayne L.Rev. 1287 (1973). While there is no evidence that the exclusion of young people on the jury venire was purposeful or motivated by animus, it is natural, if not inevitable, that a system that is structured, in large part, around the community connections of the members of the board of selectmen would yield venires that underrepresent groups of people that are less likely to be known to the jury selectors than other groups. *See Murrah v. State of Arkansas*, 532 F.2d at 109. Certainly, the opportunity for intentional or unintentional discrimination exists in Norfolk County where the venire is heavily weighed in favor of adults thirty-five to seventy. Petitioner has presented evidence that the underrepresentation between 1975 and 1978 was even more severe. We find that petitioner has made a prima facie case of systematic exclusion of young adult jurors in Norfolk County.

## III.  BURDEN UPON THE STATE

Once a petitioner establishes a prima facie violation the burden shifts to the state to justify the underrepresentation. *Duren v. Missouri*, 439 U.S. at 367, 99 S.Ct. at 670. While the states remain free to prescribe relevant qualifications and reasonable exemptions for jury selection, the right to a proper jury cannot be overcome on merely rational grounds. Rather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the selection process that result in the disproportionate exclusion of a distinctive group. *Duren v. Missouri*, 439 U.S. at 367–78, 99 S.Ct. at 670–75; *La-Roche v. Perrin*, 718 F.2d at 503; *United States v. Benmuhar*, 658 F.2d at 19. Here, the state has advanced no explanation for the underrepresentation.

## IV.  RELEVANCE OF THE COMPOSITION OF THE PETIT JURY

The state claims, and the district court below held, that even if petitioner proves a constitutional violation of the cross-section requirement in jury selection, petitioner is precluded from mounting a successful challenge because his ultimate jury contained two persons out of seven under thirty-five, a near perfect representation of young adults based on the population of Norfolk County. Petitioner claims he was nonetheless affected by the underrepresentation on the jury rolls because he did not have the same opportunity to exercise a challenge against either of the young jurors that a proper venire would have offered.

The Supreme Court has clearly stated that it is unnecessary for a petitioner to show that he was in any way prejudiced by a wrongful exclusion or that he was a member of the excluded class. *Taylor v. Louisiana*, 419 U.S. at 527, 95 S.Ct. at 696; *Peters v. Kiff*, 407 U.S. at 503, 92 S.Ct. at 2169; *Thiel v. Southern Pacific Co.*, 328 U.S. at 225, 66 S.Ct. at 988. This is due, at least in part, to the multiple purposes of the cross-section requirement.

Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case.... The broad representative character of the jury should be main-

tained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.

*Taylor v. Louisiana,* 419 U.S. at 530, 95 S.Ct. at 697 (citing *Thiel v. Southern Pacific Co.,* 328 U.S. at 227, 66 S.Ct. at 989 (Frankfurter, J., dissenting)). In *Thiel v. Southern Pacific,* the Court reversed a verdict because working people paid on a daily basis had been excluded, finding that "it ... is immaterial that the jury which actually decided the factual issue in this case was found to contain at least five members of the laboring class." *Thiel,* 328 U.S. at 225, 66 S.Ct. at 988. The Court stated:

> The evil lies in the admitted wholesale exclusion of a large class of wage earners in disregard of the high standards of jury selection. To reassert those standards, to guard against the subtle undermining of the jury system, requires a new trial by a jury drawn from a panel properly and fairly chosen.

*Id.*

In the cases after *Thiel,* the Court has continued to focus on the composition of the jury pool and not the specific jury drawn by the challenger. For instance, in *Peters v. Kiff,* 407 U.S. at 502–03, 92 S.Ct. at 2168–69, the Court found "[i]llegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well." *See also Taylor v. Louisiana,* 419 U.S. at 530, 95 S.Ct. at 697. Recently, in *Duren v. Missouri,* 439 U.S. at 366, 99 S.Ct. at 669, the Court reaffirmed its focus: "[I]n order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process." The Court did not require that the petitioner state or be able to show that the jury drawn was also underrepresented, nor did the Court suggest that the state could defeat a challenge by

showing that the actual jury, by happenstance, contained a representative number of the underrepresented group. Indeed, in his dissent in *Duren,* Justice Rehnquist stated: "[U]nder the majority's fair cross section analysis the underrepresentation of women on venires in Jackson County, Missouri, would entitle Duren to reversal of his conviction even if the jury chosen in his case had been composed of all women." *Id.* at 373, n. 1, 99 S.Ct. at 673, n. 1 (Rehnquist, J., dissenting).

Although the Court has not had occasion to directly consider a case where chance has, against great odds, dealt the defendant a representative jury, the Fifth Circuit has addressed the issue. In *Rabinowitz v. United States,* 366 F.2d 34 (5th Cir.1966) (in banc), the court found that departures from federal jury selection procedures that resulted in a systematic exclusion of blacks from the jury pool could not be cured by proof from the government that the defendant's jury contained a representative number of blacks. There, the court stated:

> The focus of the law is on the list from which the grand jury is drawn and not on the composition of a particular jury or grand jury. The efforts by Congress to broaden the base of the jury system in federal courts was an attempt to do more than improve the administration of justice at the point where it most directly touches members of the legal profession and litigants. It constituted an effort to improve the judicial system where it most directly touches the lives of the average citizen. For many citizens their only contact with the court arises from their service on grand or petit juries.
>
> Even more important is the fact that many citizens will have no direct contact with the administration of justice, but will judge its efficacy on how the judicial process functions. Congress and the courts are aware of this fact. The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts. When the basic jury list was poisoned, the fruits of

that list were also infected. To cure the infection, it is necessary to start the process anew.

*Id.* at 59–60 (citations omitted).[14] Lower courts have directly held, or in dicta stated, that the proper focus in jury discrimination cases is on the source list from which the jury is chosen and not the composition of any particular jury. *Mobley v. United States,* 379 F.2d 768, 770 (5th Cir.1967); *McGinnis v. M.I. Harris,* 486 F.Supp. 750, 756 (N.D.Tex.1980); *See also United States v. Zirpolo,* 450 F.2d 424, 428–31 (3d Cir.1971) (dicta); *Ford v. Hollowell,* 385 F.Supp. 1392, 1398 (N.D.Miss.1974) (reaffirming focus on jury list, not composition of particular jury).

In addition to requiring a showing of underrepresentation in the pool or general list, *Duren v. Missouri* appears to require petitioner to show that the systematic exclusion also infected petitioner's venire. But there is no suggestion that the composition of a particular jury is relevant. *See* 439 U.S. at 366, 99 S.Ct. at 669. The Court's directive in *Duren* indicates that when the public's interest in broad participation in the administration of justice is weighed against the public's interest in enforcing judgments against defendants who in fact receive a representative venire, the scale tips in favor of some specificity. The state claims that the considerations militating in favor of requiring the petitioner to show that his venire was tainted by exclusion also require petitioner to show that the cognizable group was underrepresented on the jury drawn notwithstanding the accepted rule that courts do not look to the particular jury to determine whether systematic

exclusion has occurred. The state cites *Harris v. Wyrick,* 644 F.2d 710 (8th Cir. 1981), in support. There, the court did state that Wyrick's jury was not underrepresented, but the holding is not as the state suggests. The decision in that case rested on a lack of proof of exclusion in defendant's venire. *Id.* at 713.

The venire is important because that is the group from which the jurors for the case are chosen. When that venire is tainted, the ability to challenge is affected. The right to challenge jurors both for cause and peremptorily has been perceived to be a critical feature of the right to a jury trial for over two hundred years and the Supreme Court has declared that denial or impairment of a defendant's right to exercise a peremptory challenge is cause for reversal without a showing of prejudice. *Swain v. Alabama,* 380 U.S. 202, 212–21, 85 S.Ct. 824, 831–36, 13 L.Ed.2d 759 (1965); *Pointer v. United States,* 151 U.S. 396, 406, 14 S.Ct. 410, 413, 38 L.Ed. 208 (1894); *Lewis v. United States,* 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892). *See also Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1967) (affirming right of peremptory challenge consonant with cross-section requirement). Even when chance has dealt a litigant a relatively representative jury, he is put in the position of having to choose between challenging a member of a grossly underrepresented group that he would like to eliminate from the jury or being tried by a jury that reflects the systematic exclusion of the jury selection process.[15] Forcing litigants to elect biased or unrepresentative juries in order to preserve their jury exclusion

**14.** Because *Rabinowitz* came out prior to the application of the sixth amendment to the states, it was grounded on the cross-section standards of the 1957 Civil Rights Act, 28 U.S.C. § 1861 (1982). Subsequently, in *Taylor v. Louisiana,* 419 U.S. at 531–32, 95 S.Ct. at 698–99 (1979), the Supreme Court approved the federal policy of selecting grand and petit juries from a cross-section of the community for implementing the requirements of the sixth amendment. The Court went on to state that its holding did not authorize the federal courts to fashion detailed jury selection codes. The leeway in application permitted the state courts is, however,

bounded by the necessity of producing jury lists that are representative of the community. *Taylor v. Louisiana,* 419 U.S. at 538, 95 S.Ct. at 701.

**15.** Holding that a jury selection system could not be attacked so long as the defendant drew a representative jury could also work against the state. The government could be put in the position of having to choose between challenging jurors that would open it up to a jury selection attack or proceeding with a biased or potentially prejudiced jury.

claims does not seem to be a sensible means of implementing the cross-section requirement. Nor is it harmonious with the federal jury selection statute and many state statutes which require a challenge to the composition of the jury venire prior to trial. *See, e.g.,* 28 U.S.C. § 1867 (1982); Mass.R.Crim.P. 13 (1980).

Moreover, the Supreme Court has repeatedly stated that the defendant's interest in an impartial trial is not the only consideration involved in the cross-section requirement. *See, e.g., Taylor v. Louisiana,* 419 U.S. at 530–31, 95 S.Ct. at 697–98; *Peters v. Kiff,* 407 U.S. at 498–500, 92 S.Ct. at 2166–67. The appearance of fairness and the rights and duties of all groups to take part in the civic responsibility of jury duties have caused the Court to stress the importance of fair and representative selection procedures. Finally, to hold that a litigant is not entitled to a representative jury when the jury venires are drawn from a fair cross-section of the community but that the cross-section requirement can be dispensed with when the dice fall a particular way in an individual case undermines the analytical foundation upon which the right to a jury drawn from a cross-section of the community is based.[16] We, therefore, continue to focus on the general venire (jury pool) and the petitioner's venire in determining whether a jury selection process systematically excludes a cognizable group.

## V. PETITIONER'S VENIRE

The state also challenges the sufficiency of the petition because petitioner did not present evidence that young adults were underrepresented on venires at the time of petitioner's trial. Petitioner claims that the statistics he produced did include the venire from which his jury was selected because Mass.Gen.Laws Ann. ch. 234, § 5 (1970) requires town jury lists to be annually drawn in August. Petitioner's study included venires drawn in October of 1980 from the August 1980 source list that was used to produce his jury panel in April of 1981. Petitioner also points out that he moved to expand his record in district court to include evidence of the representation of young adults on venires between November 1980 and April 1981. Nonetheless, petitioner's evidence raises two issues.

In *Commonwealth v. Bastarache,* decided on December 12, 1980, the Supreme Judicial Court considered a challenge to the composition of jury lists drawn under the keyman system in Massachusetts where young adults were substantially underrepresented on the lists. Although the court did not find a constitutional violation in *Bastarache,* it expressed concern with the composition of the lists and asked the attorney general to prescribe new jury selection procedures for the compilation of jury lists in those cities and towns not using a random selection process. The court suggested that in some instances jury lists be reconstituted as soon as practicable. Although the juror selection statute which reflects the keyman system has not been amended to secure randomness in the jury selection process, it is possible that the attorney general prescribed procedures which resulted in a recompilation of the jury list in Norfolk County prior to the drawing of petitioner's venire.[17] If such a recompilation occurred, then petitioner's case must be dismissed; it is grounded on statistics that are not relevant to the selec-

---

**16.** We believe a rule of law grounded on chance would only serve to effectuate a folly aptly described by Mathew Arnold,

We do not what we ought,
What we ought not to do,
And lean upon the thought
That chance will bring us through.

M. Arnold, *Empedocles on Etna,* 1. 237–40.

**17.** Although the state has not argued that the jury lists used by petitioner did not reflect the explicit procedures used to compile the list from

which petitioner's jury was drawn, we think this should be determined by the district court since the underrepresentation demonstrated by petitioner in this case exceeds the degree of underrepresentation the Supreme Judicial Court was concerned about in *Bastarache* when it suggested that new procedures be implemented. The fact that a representative jury was drawn also suggests that remedial measures may have been taken.

tion procedures in use at the time of his trial.

If the jury list in use at the time of petitioner's trial in April 1981 was the list drawn in August of 1980, then petitioner must be afforded the opportunity to produce evidence of underrepresentation of young adults on the venire from which his jury was chosen. *See Duren v. Missouri,* 439 U.S. at 366, 99 S.Ct. at 669; *Harris v. Wyrick,* 644 F.2d at 713; *United States v. Berry,* 627 F.2d 193, 196 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981). Although the parties do not indicate whether data on the petitioner's venire was available at the time of the state court challenge, the petitioner sought to introduce such information in the district court and we assume it is readily available. If the data on petitioner's venire indicates that young adults age eighteen to thirty-four were significantly underrepresented, then petitioner is entitled to a new trial drawn from a fair cross section of the community. While the Supreme Court has never identified the precise degree of underrepresentation required to meet the prima facie test for systematic exclusion, in *Swain v. Alabama,* 380 U.S. at 208–09, 85 S.Ct. at 829–30, it stated that a showing of up to 10% underrepresentation of a cognizable group was not enough, standing alone, to show systematic exclusion. While courts have occasionally found systematic exclusion where a cognizable group was underrepresented by less than 10%, the majority of decisions involve underrepresentation in excess of 10%. The percentages of underrepresentation that have been presented to courts have varied widely,[18] and courts have generally preferred to examine the underrepresentation statistics on a case-by-case basis rather than deciding upon a threshold percentage. We also believe that a determination of whether a petitioner's pool and venire indicate systematic exclusion may turn upon particular factors such as the size of the community, the size of the pool and venire, history of underrepresentation, and opportunity for discrimination in selection. *See, e.g., Blackwell v. Thomas,* 476 F.2d 443, 446–47 (4th Cir.1973) (considering opportunity for discrimination and degree of exclusion over time); *Smith v. Yeager,* 465 F.2d 272, 279 (3d Cir.1972) (discussing underrepresentation in connection with opportunity to discriminate).

Therefore, we remand to the district court for a determination of whether (1) petitioner proffered statistical evidence relevant to the composition of his particular jury venire; and, if so, (2) whether young adults were significantly underrepresented on petitioner's venire.

*Remanded.*

TORRUELLA, Circuit Judge (dissenting).

Because I believe that neither the law nor the record on appeal supports the opinion of the majority, I am forced to note my disagreement therewith.

---

**18.** The following cases illustrate the range of statistical disparities courts have found sufficient to show prima facie exclusion of a cognizable group from jury venires: *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (women underrepresented on weekly venire by 39.5% and petitioner's venire by 44.6%); *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (blacks underrepresented by 14.25% in general venire, 21% in grand jury venire); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (blacks underrepresented by 23% on grand jury); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (blacks underrepresented by 32% on grand jury and 35% on petit jury); *LaRoche v. Perrin,* 718 F.2d 500 (1st Cir.1983) (youth underrepresented by 27.6% on petit jury venires; 25.4% in grand jury); *Porter v. Freeman,* 577 F.2d 329 (5th Cir.1978) (women underrepresented by 20.4% on jury roll); *Partida v. Castaneda,* 524 F.2d 481 (5th Cir.1975) (Mexican-Americans underrepresented on grand juries by 40.2% over ten-year period to 33.7% over two and one-half-year period); *Blackwell v. Thomas,* 476 F.2d 443 (4th Cir.1973) (blacks underrepresented by 6%, 9% and 12% over three-year period); *Smith v. Yeager,* 465 F.2d 272 (3d Cir.1972) (blacks underrepresented by 19%); *Carmical v. Craven,* 457 F.2d 582 (9th Cir.), *cert. denied,* 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972) (blacks underrepresented by 18.9% in grand jury pool and 19.3% in petit jury pool).

Appellant challenges his conviction by a six-person jury in Massachusetts state court on the ground that "young adults" were allegedly systematically excluded from the venires, thus depriving him of a trial before a jury that was representative of a cross-section of the community in violation of the sixth and fourteenth amendments. Appellant's trial took place on April 21–23, 1981, shortly before which he raised the underrepresentation issue with respect to persons in the 18 to 34 age group, his definition of "young adults." His contention was based on a study made in the case of *Commonwealth v. Flaherty,* Norfolk Criminal No. 76813, wherein it was established that between October 1, 1978, and October 31, 1980, there were about half as many young traverse jurors as there would have been had the selection process ignored age.[1] The record shows that, notwithstanding this alleged bias, the petit jury that actually tried appellant's case included two persons falling within the ages 18 to 34.

It is axiomatic in challenges of this nature that, before the challenger can even make a colorable claim, the group alleged to be excluded must be a "distinctive" group. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). This requires: (1) that the group is defined and limited by some clearly identifiable factor (for example, sex or race), (2) that a common thread or basic similarity in attitude, ideas, or experience run through the group, and (3) that there is a community of interest among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. *See Willis v. Zant,* 720 F.2d 1212, 1216 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984).

Although the Supreme Court has not ruled upon whether age groups are "distinctive" enough for sixth amendment purposes, every circuit that has considered this issue, except the First, has ruled against appellant's contention. *See United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977); *United States v. Olson,* 473 F.2d 686, 688 (8th Cir.), *cert. denied,* 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *United States v. Guzman,* 337 F.Supp. 140, 145 (S.D.N.Y.), *aff'd,* 468 F.2d 1245 (2d Cir. 1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973); *Brown v. Harris,* 666 F.2d 782, 783–84 (2d Cir.1981), *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982); *United States v. Gast,* 457 F.2d 141 (7th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972); *Davis v. Greer,* 675 F.2d 141, 146 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Di Tommaso,* 405 F.2d 385, 391 (4th Cir.1968), *cert. denied,* 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969); *Cox v. Montgomery,* 718 F.2d 1036, 1038 (11th Cir.1983); *United States v. Test,* 550 F.2d 577 (10th Cir.1976). *Contra United States v. Butera,* 420 F.2d 564 (1st Cir.1970); *La Roche v. Perrin,* 718 F.2d 500 (1st Cir. 1983). What bothers me most about the rule reaffirmed today is not so much the loneliness of our unique position[2] as its arbitrariness, a conclusion that is partially admitted by the majority. *See supra* p. 987. In *Butera, supra,* we held persons between 21 and 34 to be a "distinctive" group. In *La Roche,* the ages were 18 to 34, as here. In those cases, as in the present one, no evidence was required to establish the viability of these age groups. How then can we conclude that the parameters should be 18 to 34, or 21 to 34? Why not 18 to 24, or 19 to 30, or 22 to 31, or whatever suits the fancy of the particular defendant in question? Neither *Butera,*

---

**1.** If persons over 70 years old were excluded, "young adults" aged 18 to 34 were 41.46 of the population, but only 18.68% of the jury venires, while if persons over 70 were included, "young adults" were 37.82% of the population, but only 18.16% of the jury venires.

**2.** Referred to by the Fifth Circuit as a "judicial rarity." *See Foster v. Sparks,* 506 F.2d 805, 824 (5th Cir.1975).

*La Roche,* nor the majority opinion in this case sets out a formula or principle that will allow future decisionmakers, judicial and non-judicial, to establish the limits of groups in which age is the allegedly invidious factor.

The *Butera* case makes no reference to any scientific or factual evidence at the trial level as the basis for holding that 21 to 34 year-olds are a "distinct" group, but rather relies on the following conclusion:

> Nor can we close our eyes to the contemporary national preoccupation with a "generation gap", which creates the impression that the attitudes of young adults are in some sense distinct from those of older adults. This apparent distinctiveness is sufficient for us to say that [young adults cannot] be excluded from jury pools without some justification.

*United States v. Butera, supra,* 420 F.2d at 570. In *La Roche,* which includes a strong dissent by one panel member regarding the precise issue before us (*see* 718 F.2d at 505), the court simply follows *Butera,* with no social science or other data at the trial level to support findings of fact that would meet the *Willis v. Zant* test. If such "judicial notice" is appropriate, I could just as validly state that there are very *wide* gaps in the attitudes, ideas, experiences, and interests among persons between the ages of 18 and 34, and that therefore those parameters are not appropriate. Of course, such a statement on my part would have no value for purposes of deciding this case, as it would be unsupported by *evidence.* More accurately, such a conclusion on my part would be the product of subjective intuition, hardly an appropriate basis for the present ruling.

The majority opinion attempts to correct the lack of a factual basis on the record for concluding "cohesiveness" of the proposed group by reference to the "many sociologists [who] contend that young people do comprise a class with distinctive values, outlooks, manners, roles, and behavior patterns." *See supra* pp. 987–88. Such statements of alleged fact should have properly been the subject matter of expert and factual testimony at the trial level, where a record could have been made after granting the opportunity to all parties to cross-examine witnesses and present rebuttal evidence. We would then be in a position to reverse, if the trial court's factual findings were found to be clearly erroneous. Unfortunately, such a record has not only not been made, but the majority is proceeding to supplement what scant record there is on this issue, *ex parte* and on appeal, by reference to social science *literature.* This I believe to be contrary to established procedure. *See* Rule 10(a), Federal Rules of Appellate Procedure; *Landy v. Federal Deposit Insurance Corporation,* 486 F.2d 139, 150 (3rd Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973); *Kemlon Products & Development Co. v. United States,* 646 F.2d 223 (5th Cir.1981).

For these reasons the opinion below should be affirmed.

## ON PETITION FOR REHEARING EN BANC

Before CAMPBELL, Chief Judge, COFFIN, BOWNES, BREYER and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This matter is before us for review *en banc* of our decision in *Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) wherein we reaffirmed the holding of this circuit, first espoused in *United States v. Butera,* 420 F.2d 564 (1st Cir.1970), to the effect that "young adults" (ages 18–34) constitute a sufficiently cohesive group to be cognizable in determining whether they are adequately represented within the jury venires for sixth amendment purposes. Upon further consideration we reverse our prior ruling in this case and overrule our holding in *Butera* and its progeny.[1]

We need only a brief restatement of the most relevant facts, which were otherwise

---

**1.** *See La Roche v. Perrin,* 718 F.2d 500 (1st Cir.1983).

adequately covered in our earlier opinion. At his trial before the Superior Court of Massachusetts, appellant challenged the composition of the venires from which was chosen the jury that tried and convicted him. As indicated, his challenge was based on his contention that persons between the ages of 18 to 34, his definition of "young adults," were under-represented in the venires. He supported this allegation by presenting in evidence a study [2] that statistically establishes a substantial disparity in the traverse jurors in the 18 to 34 age group as compared with the general population encompassing this age group. Appellant presented no other evidence before the state trial court on this issue. This challenge was denied at all state court levels, as well as by the district court in a petition for relief under 28 U.S.C. § 2254.

Apparently appellant was under the misapprehension, as he has been throughout this appeal, that the establishment of mere statistical disparity in the chosen age group is sufficient to establish a prima facie violation under the sixth amendment. It is beyond argument, however, that the first step in such a claim is the demarcation of a "distinctive" group. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). This requires: (1) that the group be defined and limited by some clearly identifiable factor (for example, sex or race), (2) that a common thread or basic similarity in attitude, ideas, or experience run through the group, and (3) that there be a community of interest among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. *See Willis v. Zant*, 720 F.2d 1212, 1216 (11th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984). The reason for these requirements is readily apparent. In choosing a jury we are looking not merely for a statistical mirror of arbitrary segments of the population's composition. The goal that we seek is that the jury generally represent the attitudes, values, ideas and experience of the eligible citizens that compose the community where the trial is taking place.

The Supreme Court has never gone so far as to hold that the constitution requires venires to be, statistically, a substantially true mirror of the community. *See Duren v. Missouri, supra; Taylor v. Louisiana, supra; Fay v. New York*, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); *United States v. Blair*, 493 F.Supp. 398 (D.Md.1980), *aff'd*, 665 F.2d 500 (4th Cir.1981). While courts often speak in terms of "fair cross section," they have realized that practical reasons, as well as the sterility of such an endeavor, militate against total realization of this ideal. *United States v. Hafen*, 726 F.2d 21 (1st Cir.1984), *cert. denied*, — U.S. —, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); *United States v. Gregory*, 730 F.2d 692 (11th Cir. 1984), *reh'g denied*, 740 F.2d 979 (1984); *United States v. López*, 588 F.2d 450 (5th Cir.1979), *reh'g denied*, 591 F.2d 102 (1979), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 319 (1979), *reh'g denied*, 444 U.S. 888, 100 S.Ct. 188, 62 L.Ed.2d 122 (1979). Some people are simply less available than others to serve as jurors, such as highly mobile people, with few local contacts like college students or traveling salesmen; people tied to jobs that are traditionally considered essential to the welfare of the community like firemen, police officers, physicians; and people with social or physical impairments like alcoholics, the hearing impaired, or individuals not versant in the English language. Because a true cross section is practically unobtainable, courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not *actively* prevent people from serving or actively discriminate, and so long as the system is reasonably open to all. *United States v. Hafen, supra; United States v. Gregory, supra; United States v. López, supra; Hansen v. United States*, 393 F.2d 763 (8th

---

**2.** Prepared in connection with *Commonwealth v. Flaherty*, Norfolk Criminal No. 76813.

Cir.1968), *cert. denied*, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968). Strict statistical analysis has been used only in situations where *special* groups that have been discriminated against are involved. *Duren v. Missouri, supra; Taylor v. Louisiana, supra.*

Only if we test the goal of communal attitudinal representation against groups that can be identified through principled criteria can we adequately conclude whether the goal has been met. Furthermore, only if principled criteria are established, can appropriate guidance be given to courts and administrators to allow them to determine, in the future, not only whether the goal has been achieved, but also the composition of other groups that litigants may wish to challenge.

■ In the present case there is simply no evidence in the record for determining that people between the ages of 18 and 34 (as opposed to some other ages) belong to a particular group. The essence of a distinctive group is that its members share specific common characteristics. Yet, what can we identify as the common characteristics of people in an age group that spans a sixteen-year gap, covering such dynamic years in a person's life as those that are encompassed between the ages of 18 to 34? To be sure, they are all younger than people over 34. But what is the evidence that the attitudes and thinking of, say, 30 year olds have more in common with 18 year olds than they do with 40 year olds, or for that matter, going to the other end of the scale, that 18 year olds have more in common with 28 year olds than with 16 year olds? How do we know that there should not be two groups, 18 to 28 and 28 to 35, or three, or four groups encompassing other boundaries?

The only way to establish the present group, particularly in view of the absence of any scientific or expert evidence in this record, is by arbitrary fiat superimposed on intuition. Even assuming we can be flatly arbitrary, we cannot seriously say that a grouping whose contours are rationally unsupportable is "distinctive." Is not a "distinctive" group, by definition, one whose membership is reasonably set apart from others by clear lines of demarcation?[3] *See United States v. Potter*, 552 F.2d 901 (9th Cir.1977).

■ Without much effort we can point to various significant social indicators that would seem to punctuate clear differences in the attitudes, values, ideas and experiences of 18 year olds vis-a-vis 34 year olds, to pick only the outer boundaries of appellant's "young adults" classification. Taking judicial notice[4] of official statistics[5] we can note meaningful contrasts in such social indicators as their marital and divorce rates,[6] school enrollment[7] and educational attainment,[8] economic status,[9] employment

---

3. *Webster's Third New International Dictionary (Unabridged),* 1971 ed., p. 659, defines "distinctive" as: serving to distinguish, setting apart from others, individualizing; characteristic, peculiar; special; discriminating. *Black's Law Dictionary,* Fifth Edition, p. 425, defines "distinct" as: clear to the senses or mind; easily perceived or understood; plain; unmistakable. Evidently not identical; observably or decidedly different.

4. Fed.R.Evid. 201.

5. Unless otherwise indicated, they are contained in U.S. Bureau of the Census, *Statistical Abstract of the United States, 1982–83,* (103d ed.), Washington, D.C., 1982, hereinafter referred to as *Abstract.*

6. *Abstract,* "Table No. 49. Marital Status of the Population, by Sex and Age, 1981," p. 39. *See*

*also* "Table No. 124. Marriages and Divorces: 1950 to 1979," p. 82.

7. *Abstract,* "Table No. 221. School Enrollment and Rate, By Age Sex and Race: 1960 to 1981," p. 140.

8. Bureau of the Census, U.S. Dep't of Commerce, Chap. D, "Detailed Population Characteristics," Part 1, § A: United States Tables 253–310 (March 1984).

9. *Abstract,* "Table No. 671. Median Weekly Earnings of Full-Time Wage and Salary Workers, By Selected Characteristic: 1970 to 1981," p. 404; *Abstract,* "Table No. 711. Money Income of Households—Aggregate and Mean Income, By Race and Spanish Origin of Householder: 1980," p. 431, *see* columns on age of householder, for all races; and *Abstract,* "Table No. 723.

rate,[10] criminality,[11] experience in such matters as service in the armed forces in time of war or even in peacetime,[12] mental health,[13] attitude towards such important social issues as abortion,[14] and participation in the political processes,[15] and in the ownership of capital property.[16] Such differences emphasize the inappropriateness of grouping potently dissimilar age categories, if we are to do other than pay mere lip service to the teachings of *Duren.*

Of course, we can say, "It does not matter what the precise contours are—disproportionality is bad whether the group is 18 to 28, 18 to 35, or 18 to 45." But if we establish this criteria without more, must we not also be prepared to let each complainant's attorney select his own age group, based solely upon the age boundaries that suit his purposes by showing the greatest statistical disparity, merely to gain tactical advantage rather than to meet constitutional standards? If we take this approach, then we are clearly doing something different from what the Supreme Court contemplated when it formulated the "distinctive group" concept in *Duren.* We are losing sight of the goal pursued, that of seeking attitudinal representativeness, and exchanging it for statistical bureaucracy. And as a corollary to all this, those charged with administering the day-to-day workings of the jury system would have great difficulty in determining whether they have complied with the Constitution if they have to contend with such a fluid mark. What

guidelines or criteria will they use to determine whether all "groups" are properly represented in the venires?

Implying that any important deviation from a statistical cross section is suspect is torturing the words "distinctive group" into a very different concept. The *Duren* court used the concept of "distinctive group" in a case where women were subjected to discrimination. It is fair to assume that the court wanted to give heightened scrutiny to groups needing special protection, *not to all groups generally.* There is nothing to indicate that it meant to take the further step of requiring jury venires to reflect mathematically precise cross sections of the communities from which they are selected. Yet if the age classification is adopted, surely blue-collar workers, yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications will be entitled to similar treatment. These are not the groups that the court has traditionally sought to protect from underrepresentation on jury venires. *See, e.g., Hill v. Texas,* 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) (blacks); *Duren v. Missouri, supra* (women); *United States v. Brady,* 579 F.2d 1121 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979) (Indians).

■■■ That is not to say, however, that if a classification were *specifically* and *systematically excluded* from jury duty the same standard would be used as here, where defendant simply relies on a statisti-

---

Median Money Income of Year-Round Full-Time Workers with Income, By Sex and Age: 1970 to 1980," p. 438.

**10.** *Abstract,* "Table No. 626. Civilian Labor Force and Participation Rates, By Race, Sex, and Age: 1960 to 1981," p. 377.

**11.** *Abstract,* "Table No. 303. Persons Arrested—Sex, Age and Race: 1970 to 1981," p. 181; *Abstract,* "Table No. 330. Jail Inmates—Selected Characteristics: 1978," p. 192.

**12.** *Abstract,* "Table No. 612. Living Veterans, By Age and Period of Service: 1981," p. 366.

**13.** Centers for Disease Control, U.S. Dep't of Health and Human Svcs., "Suicide Surveillance, 1970–1980" (April 1985).

**14.** Centers for Disease Control, U.S. Dep't of Health and Human Svcs., "Abortion Surveillance, 1979–1980" (May 1983).

**15.** *Abstract,* "Table No. 805. Voting-Age Population, and Percent Reporting Registered and Voted: 1972 to 1980," p. 492.

**16.** *Abstract,* "Table No. 860. Stock Ownership—Characteristics of Shareholders: 1959 to 1981," p. 519; *Abstract,* "Table No. 1146. Farm Operators—Tenure and Characteristics: 1974 and 1978," p. 654; *Abstract,* "Table No. 1367. Recent Home Buyers—General Characteristics and Downpayments: 1976 to 1981," p. 762.

cally disparity in the venires to challenge its constitutionality. If certain people are specifically and systematically excluded from jury duty, then the jury-administrating authority would have created its own group. Clearly, the state has no right to deliberately exclude specific classes or groups from juries without some very special reason. Thus, it may not *forbid* blue-collar workers, chess players, Masons, etc., from serving on juries. But if there are, as in the present case, mere statistical imbalances, unexplained, the problem is different. Statistical imbalances can be due to a host of factors—younger people may be away at school, serving in the armed forces, surfing in Hawaii, etc. Unless one is prepared to say that there is an affirmative constitutional duty to produce a true cross section on the venire for every imaginable group that exists in our complex society, something which no court has even come close to holding, we should avoid the overwhelming problems and sterile solutions that will result from attempting to subdivide a continuum of ages into "distinctive groups."

Although the Supreme Court has not ruled upon whether age groups are "distinctive" enough for sixth amendment purposes (*cf. City of Cleburne, Texas v. Cleburne Living Center*, —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313, decided July 1, 1985, in which the court indicated its declination "to extend heightened [equal protection] review to differential treatment based on age."), every circuit that has considered this issue, except the First, until now, has ruled against appellant's contention. *See United States v. Potter*, 552 F.2d 901, 905 (9th Cir.1977); *United States v. Olson*, 473 F.2d 686, 688 (8th Cir.), *cert. denied*, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *United States v. Guzman*, 337 F.Supp. 140, 145 (S.D.N.Y.), *aff'd*, 468 F.2d 1245 (2d Cir.1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973); *Brown v. Harris*, 666 F.2d 782, 783–84 (2d Cir.1981), *cert. denied*, 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982); *United States v. Gast*, 457 F.2d 141 (7th Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972); *Davis v. Greer*, 675 F.2d 141, 146 (7th Cir.), *cert. denied*, 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Di Tommaso*, 405 F.2d 385, 391 (4th Cir.1968), *cert. denied*, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969); *Cox v. Montgomery*, 718 F.2d 1036, 1038 (11th Cir.1983); *United States v. Test*, 550 F.2d 577 (10th Cir.1976). We are convinced not by the weight of their numbers but by that of the logic and policy they espouse. We thus join them.

Our earlier decision is vacated and the decision of the district court is affirmed. No costs.

BOWNES, Circuit Judge (dissenting).

The list that was used to draw Barber's jury pool contained three items of information: names, addresses, and the dates of birth of potential jury candidates. The jury venires that were selected during a twenty-five-month period from October 1978 through October 1980 contained less than half of the young adults an age-blind selection process should have produced.[1] The probability of this discrepancy occurring by chance is less than one in one hundred quadrillion.[2] Nonetheless, the court finds that Barber's jury pool and venire contained a fair cross section of the

---

**1.** In the period between January 1, 1978, and October 31, 1980, 37.82% of the general population of Norfolk County consisted of persons aged 18 to 35 and 18.16% of the jury venire consisted of persons 18 to 35. If adults over the age of 70 are excluded from the analysis because they can elect to exempt themselves under Mass.Gen.Laws Ann. ch. 234, § 1 (1984), then young adults constitute 41.46% of the eligible jurors and were selected for the venire only 18.68% of the time. The difference between the proportion of young adults in the population and the proportion of young adults on the venires was 19.56%. Excluding adults over 70, the discrepancy was 22.78%.

**2.** Based on statistical evidence presented by petitioner in his motion to dismiss the jury venire. The evidence consisted of a report on jury venires in Norfolk County 1978–1980 compiled by a court-appointed special master in *Commonwealth v. Flaherty,* Norfolk County Criminal No. 76318.

community as required by the sixth amendment. In so finding, the majority holds that young adults 18–35 do not comprise a distinctive group within the community that must be included in the jury selection process although it also finds that such persons cannot be overtly excluded from it.

I believe that young adults between 18 and 35 do comprise a substantial and identifiable group that cannot be systematically excluded from jury pools. Where, as here, the jury pool selectors possessed specific age information on potential jury pool members they had the obvious opportunity to discriminate against jurors on the basis of age. I think it clear that the disparity between the number of young adults under 35 in the jury venires and the number of such young adults in the population is a result of systematic exclusion.

## I

Young adults between 18 and 35 constitute both a large (37.82% of the population) and easily identifiable group (all that is needed are birthdates) in Norfolk County. It seems indisputable that an individual's response to nearly every facet of his or her life, including life goals and ambitions, health, personal relationships, family and death, evolve and change over the course of one's adult life. And, despite the fact that societal distinctions based on age are ubiquitous, affecting everything from insurance rates to availability for military service, eligibility for political office and media advertising campaigns, the majority believes this is inadequate justification for finding that adults 18–35 comprise a discernible group for jury selection purposes.

The majority decides that young adults between 18 and 35 are not a cognizable group for sixth amendment purposes because there are differences in attitudes, experiences, and ideas within the group and because petitioner has not shown that all young adults possess a community of interest different from persons 35 and older that would be inadequately represented if persons under 35 are excluded from the jury selection process. If this is a sound premise, it is unclear to me why the majority believes that young adults cannot be *"actively"* or *"systematically"* excluded. (*See supra* p. 999.) The holding that young adults are not a cognizable group and, therefore, need not be included in the jury pool to make it a reasonable cross section of the community, but cannot be overtly excluded is inherently contradictory. Indeed, if the conjunction of age information as to each potential venireman and the dramatic disproportionality of representation of young adults is not enough to prove systematic discrimination, at least as a *prima facie* matter, the majority's concession would seem to be reserved for the unlikely case in which there is smoking-gun evidence in the form of explicitly discriminatory statements.

I do not agree with the majority's attempt to distinguish this case from others in which the Supreme Court has taken judicial notice of cognizable groups. Diversity within a group and overlap of attitudes and experiences of group and nongroup members are as characteristic of groups the Supreme Court has repeatedly recognized to be cognizable as petitioner's young adult group. In *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), the Court found that women constituted a cognizable group despite the government's protestations that women do not act as a class or have common attitudes, experiences and ideas. The Court stated:

[I]t is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference.

Yet a flavor, a distinct quality is lost if either sex is excluded.

*Id.* at 193–94, 67 S.Ct. at 264 (footnote omitted). In *Peters v. Kiff,* 407 U.S. 493, 503–04, 92 S.Ct. 2163, 2168–69, 33 L.Ed.2d 83 (1972), the Court reaffirmed this view:

When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented. [Footnote omitted.]

In addition to women and blacks, the Supreme Court has recognized the cognizability of Mexican-Americans (*Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954)), daily wage earners (*Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946)), and persons holding personal or religious scruples against capital punishment who are able to act impartially (*Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *accord Wainwright v. Witt,* —— U.S. ——, ——, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985)). Other circuit courts have recognized the cognizability of Indians (*United States v. Brady,* 579 F.2d 1121 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979)), and Jewish persons (*United States v. Siragusa,* 450 F.2d 596 (2d Cir.1971), *cert. denied,* 405 U.S. 974, 92 S.Ct. 1195, 31 L.Ed.2d 248 (1972)). All of these groups contain persons with a broad and diverse range of attitudes and experiences and many members of these cognizable groups undoubtedly share the attitudes and experiences of persons outside the group. To require a litigant to show that the members of a group are influenced by the same factors or cast their vote as a lot would make a mockery of the democratic values the jury system is designed to protect. It would require a litigant to stereotype and overgeneralize the attributes and experiences of a group in order for it to be recognized as one against which discrimination is unconstitutional. *See Thiel v. Southern Pacific,* 328 U.S. at 223–24, 66 S.Ct. at 987.

The validity of a petitioner's challenge depends, of course, on his showing that a "substantial" group has been excluded. It may well be that narrow age spans would not constitute a large enough percentage of the population to be cognizable. Here, however, where petitioner has used an age span encompassing virtually all those who could be classified as young adults and a group comprising 38% of the population, it is clear that the group is substantial enough to require inclusion in the process. The majority finds that the contours of the group of persons identified as young adults between 18 and 35, is too amorphous to have constitutional significance. But amorphousness is not confined to age groups. In what generation does a Mexican-American or Puerto Rican become simply a Texas or New Yorker and cease to be part of a cognizable group? Very few groups can be descriptively circumscribed by legal definitions. In *Thiel* the Supreme Court recognized what this court does not, that broad groups, even if not susceptible to precise definition, contribute to the fabric of our society and the vitality of our justice system and cannot be sifted out of the jury selection process. *See* 328 U.S. at 220, 66 S.Ct. at 985.

The real basis of the court's opinion seems to be the majority's belief that adults between the ages of 18 and 35 do not constitute a "special group" worthy of heightened scrutiny. *See supra* at 986. In their bright-line fever to confine cognizability the majority compresses the sixth amendment cross-section requirement into the equal protection clause. This they do in face of the Supreme Court's long-standing and consistent position that the two are not congruent. *See, e.g., Peters v. Kiff,* 407 U.S. 493, 499–500, 92 S.Ct. 2163, 2166–67, 33 L.Ed.2d 83 (1972) ("even in 1880 the Court recognized that other constitu-

tional values [besides the equal protection clause] were implicated"); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (finding women to be a cognizable class thirty and twenty-five years before the equal protection clause was found to require heightened scrutiny for women); *Thiel v. Southern Pacific Co.*, 328 U.S. at 220, 66 S.Ct. at 985 (identifying cognizable groups as including economic, social, religious, racial, political and geographic groups within a community). The Court has explicitly stated that enforcement of the sixth amendment cross-section requirement is not confined to enforcement of the equal protection clause.

The principle of the representative jury was first articulated by this Court as a requirement of equal protection, in cases vindicating the right of a Negro defendant to challenge the systematic exclusion of Negroes from his grand and petit juries. *E.g., Smith v. Texas*, 311 U.S. 128, 130 [61 S.Ct. 164, 165, 85 L.Ed. 84] (1940). Subsequently, in the exercise of its supervisory power over federal courts, this Court extended the principle, to permit any defendant to challenge the arbitrary exclusion from jury service of his own or any other class. *E.g., Glasser v. United States*, 315 U.S. 60, 83–87 [62 S.Ct. 457, 470–72, 86 L.Ed. 680] (1942); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 [66 S.Ct. 984, 985, 90 L.Ed. 1181] (1946); *Ballard v. United States*, 329 U.S. 187 [67 S.Ct. 261, 91 L.Ed. 181] (1946). Finally it emerged as an aspect of the constitutional right to jury trial in *Williams v. Florida*, 399 U.S. 78, 100 [90 S.Ct. 1893, 1905, 26 L.Ed.2d 446] (1970).

*Peters v. Kiff*, 407 U.S. at 500 n. 9, 92 S.Ct. at 2167 n. 9. In *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 330, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970), the Supreme Court delineated the scope of the cross-section requirement:

[T]he very idea of a jury [is] "a body truly representative of the community," composed of "the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." [Footnotes omitted.]

In *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, a case involving discretion in the selection of women jurors prior to the application of heightened scrutiny for women under the equal protection clause, the Court spelled out the duties of jury selectors in meeting the cross-section requirement.

Th[e] duty of selection … must always accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a "body truly representative of the community," and not the organ of any special group or class. If that requirement is observed [the jury commissioners] … may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community.

315 U.S. at 85–86, 62 S.Ct. at 471–72.

While the Constitution does not require a defendant's *jury* to be a true mirror of the community, the Constitution does require that the venire reasonably reflect the composition of the community. *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 701; *Carter v. Jury Commission*, 396 U.S. at 339, 90 S.Ct. at 528; *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984. The position taken by the court that the cross-section requirement of the sixth amendment requires only that "special groups" such as women and blacks not be systematically excluded is contrary to the principles embodied in the sixth amendment and articulated in Supreme Court precedent.

## II

To avoid the logical result of their non-cognizability finding—that young adults can be completely excluded from all jury

pools and venires—the majority also breaks rank with established Supreme Court precedent on the issue of systematic exclusion. My colleagues state that petitioner's showing of a substantial disparity coupled with the opportunity for the selectors to discriminate is insufficient to show systematic exclusion, but had petitioner been able to show active discrimination (*i.e.*, if a statute had specifically excluded young people or a jury selector had testified that he had excluded persons under 35) their conclusion would be different. *See supra* at 1000. Here again, my colleagues focus only on the law of equal protection challenges to the exclusion of sixth amendment principles. Their finding that evidence of intentional discrimination is required is directly counter to the law the Court stated in *Duren v. Missouri,* 439 U.S. 357, 366, 99 S.Ct. 664, 669, 58 L.Ed.2d 579 (1979):

> [I]n order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process. Petitioner's proof met this requirement. His undisputed demonstration that a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized.

If that statement can be considered equivocal, the Court's note two pages later cannot: "In contrast [to the equal protection cases], in Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair cross section. The only remaining question is whether there is adequate justification for this infringement." *Id.* at 368 n. 26, 99 S.Ct. at 670 n. 26. *See also Jones*

*v. Georgia,* 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967) (per curiam); *Coleman v. Alabama,* 389 U.S. 22, 23, 88 S.Ct. 2, 3, 19 L.Ed.2d 22 (1967) (per curiam); *Whitus v. Georgia,* 385 U.S. 545, 551, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

In *Turner v. Fouche,* 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970), the Court held that where "appellants demonstrated a substantial disparity ... [and where] [t]hey further demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria[,] [t]he appellants thereby made out a prima facie case of jury discrimination...." In this case, petitioner presented evidence that the manner of selection of jury venires in Norfolk County at the time of his trial was the key-man system. Mass. Gen.Laws Ann. ch. 234, § 4 (1970). Under the key-man system, the board of selectmen prepares a list of inhabitants of good moral character, sound judgment, not subject to exception, not exempt, and whom the selectman think qualified to serve as jurors. The list contains only the names of persons determined to be qualified. The determination is made in one of three ways: upon the knowledge of one of the board; after personal appearance before the board; or after examination of a questionnaire answered under oath. In oral argument the petitioner stated, and the state did not dispute, that the list from which petitioner's jury venire was drawn contained the names, addresses, and birthdates of potential jury venire candidates. Where more than one person lived at the same address, the household members were listed chronologically from oldest to youngest.[3] While there is no evidence that the

---

3. The petitioner has suggested that the jury selectors in compiling the list chose the older members of a household of more than one eligible jury candidate. This case seems to be very closely analogous to the facts in *Hernandez v. Texas,* 347 U.S. 475, 480 n. 12, 74 S.Ct. 667, 671 n. 12, 98 L.Ed. 866 (1954), wherein the Supreme

Court found systematic exclusion where the petitioner showed a significant disparity between Mexican-Americans in the population and in the jury pool and on the grand jury and the Supreme Court hypothesized that people with Spanish-sounding surnames had been passed over by the selectors.

exclusion of young people on the jury venire was motivated by hostility or a belief that young adults were less capable of serving as jurors rather than speculation that young adults might be less available for service, the failure of the key-man system to produce a cross-sectional age representation in jury venires cannot be excused by blameless motives of the jury selectors. Regardless of the intention of the jury administrators, the results produced determine the validity of the process employed. *Hernandez v. Texas,* 347 U.S. at 482, 74 S.Ct. at 672; *Thiel v. Southern Pacific,* 328 U.S. at 224–25, 66 S.Ct. at 987–88. No jury commission should be exonerated simply because it did not act in bad faith. *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). Whenever consistent and significant disparities are found between the proportion of a substantial and identifiable group in the community and the proportion of that group in the composition of jury venires and petitioner demonstrates that there is an opportunity for discrimination in the selection process, I believe the burden of proving that the guarantees of the sixth amendment cross-section requirement have been met rests on the responsible officials.[4]

### III

Although I do not think that the analysis offered by my colleagues properly recognizes the principles of the sixth amendment articulated by the Supreme Court, stating just what the test for cognizability should be is not an easy task. The Supreme Court has wrestled with the problem of distinctiveness in a number of different contexts and has chosen to take judicial notice of the distinctiveness of groups without much ex-

planation of the criteria used. Rather, the Court has recognized that any group is composed of dynamic individuals with individualized life experiences, perspectives, and beliefs. It has recognized that broad categorizations are not possible and, in fact, not particularly desirable in the pursuit of eliminating discrimination. To that end, when identifying distinctive groups, the Court has never identified what it is that distinguishes a group from other groups; it has identified no particular attitudes, beliefs, or experiences that would necessarily distinguish Mexican-Americans from non-Mexican-Americans, blacks from non-blacks, and women from men. The Court explains that distinctiveness is "a flavor," *Ballard,* 329 U.S. at 194, 67 S.Ct. at 264, or "qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable," *Peters v. Kiff,* 407 U.S. at 503, 92 S.Ct. at 2169. Under this approach, I would not attempt, as my colleagues do, to compare the relative "flavor" of one clearly identifiable group versus another. I would hold that a petitioner can challenge the nonrepresentation of any substantial and identifiable group. Once identified, the petitioner must show a substantial disproportion between the community group and the jury group and the potential for a nonrandom selection process. Then, I would hold that the burden shifts to the state to explain the discrepancy. The majority finds this would be untenably burdensome to the state. I think they overstate the administrative burden involved.

I do not believe that the number of groups that could be used to successfully challenge a jury venire would be infinitely large unless the jury system is not producing a reasonable cross section of the com-

4. The burden is particularly appropriate in this case: the Massachusetts Supreme Judicial Court had considered an age-group challenge to the composition of jury lists drawn under the key-man system in Massachusetts approximately one year prior to petitioner's motion to dismiss the unrepresentative venire. *Commonwealth v. Bastarache,* 382 Mass. 86, 414 N.E.2d 984 (1980).

In *Bastarache,* the Supreme Judicial Court expressed concern with the underrepresentation of young adults and directed the attorney general to prescribe new jury selection procedures for the compilation of jury lists in those cities and towns not using a random selection process. *Id.* 414 N.E.2d at 995.

munity. For example, if young persons are underrepresented by 50%, there are three possible causes for it: (1) the pool and venire represent the phenomenal one in millions possibility that is due to pure chance; (2) young adults under thirty-five *are* being identified and excluded in some fashion;[5] or (3) young adults are being selected for the pool and drawn for the potential venire but are not making it into the venire because of exemptions and exclusions. The first possibility is so unlikely that it would not affect the jury selection process in any significant way. The second possible cause, identification and exclusion of a substantial group by the state, appears to me to be inimical to the right to a jury drawn from a fair cross section of the community regardless of what the group is, unless the state demonstrates that the exclusion manifestly and primarily advances a significant state interest.[6] *See Duran v. Missouri*, 439 U.S. at 367–68, 99 S.Ct. at 670–71. If underrepresentation is due to the third possibility—young adults under thirty-five are excused or exempted in greater numbers than other persons—it seems reasonable to require the state to produce evidence of it.

My colleagues have attempted to explain away the substantial disparity in this case between young adults in the venires and young adults in the population by speculating that young adults might be less available to serve as jurors because they are attending college, serving in the Armed Forces or surfing in Hawaii. *See supra* at 1000. I believe that speculating as to such matters without evidence of any sort is hazardous at best and, at worst, an inappropriate injection of personal beliefs into the judicial process. The "some people are simply less available as jurors" speculation

can be applied to any group and would completely undermine the cross-section rule if applied across the board. This very argument has been rejected by the Supreme Court in *Thiel* (daily wage earners) and *Ballard* (women). Rather than permitting jury selectors or courts to make assumptions about the ability or availability of groups of people to serve, the Court has held that

> [r]ecognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

*Thiel v. Southern Pacific Co.*, 328 U.S. at 220, 66 S.Ct. at 985.

The majority has asserted that requiring a state to explain the reasons for a substantial statistical disparity would lead to overwhelming administrative problems. Experience shows that requiring a state to provide the reason that an individual was not part of the jury venire or a group of individuals were underrepresented on the venire does not disrupt the smooth running of a jury selection system. All it requires is that the state grant excusals and exemptions upon written explanation. The explanations are then filed along with the jury questionnaires that are returned indicating the candidates which are qualified to serve. Both the jury questionnaires and excusals/exemptions are available to defendants and the government. This procedure is currently followed in several Massachusetts counties as well as the federal courts. *See* Mass.Gen.Laws Ann. ch. 234A (West

---

**5.** Another related possibility is that adults under thirty-five are part of a larger group or contain a significant small group against which there is direct discrimination.

**6.** *See Hamling v. United States*, 418 U.S. 87, 137–38, 94 S.Ct. 2887, 2917–18, 41 L.Ed.2d 590 (1974) (filling of jury wheel every four years not

unconstitutional, although it means some persons will not be qualified as soon as eligible); *United States v. Benmuhar*, 658 F.2d 14 (1st Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982) (government interest in conducting court in national language is significant).

Supp.1984–85) (governing Middlesex, Suffolk, Hampden and Worcester Counties); Federal Jury Selection Act, 28 U.S.C. §§ 1863–1866 (1982).

Not only does such a procedure serve to illuminate the composition of the jury venire, promoting the public's perception that it fairly reflects the community, but it should cut down on the number of challenges. Defendants are able to determine for themselves the reasons for excusal from the venire before moving the court for a new jury venire or petitioning the court for money to analyze the composition of jury pools and venires. Under the court's decision, a petitioner (and ultimately the court in indigent cases) will have to bear the burden of engaging an expert to testify as to whether a group is "special" enough to be deemed a necessary part of a jury venire, an investigator to pursue the reasons for the undocumented underrepresentation as well as a statistician to protect his or her sixth amendment rights.

By finding that only a few "special groups" can be assured a place in jury venires and that the "fair cross section" requirement is an impractical "ideal," the court emphasizes one of the distinctions between the young and old to which I would rather not ascribe: "Your old men shall dream dreams, your young men shall see visions." JOEL: 2:28.

COFFIN, J., concurs fully in this dissent.